**FILED**
**U.S. District Court**
**District of Kansas**
07/24/2026
**Clerk, U.S. District Court**
**By:** SND **Deputy Clerk**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

**BRADLEY GILLESPIE,**

      **Plaintiff,**

      v.                        **CASE NO.  25-3265-JWL**

**DARCIE HOLTHAUS, et al.,**

      **Defendants.**

## MEMORANDUM AND ORDER

Plaintiff Bradley Gillespie brings this pro se civil rights action under 42 U.S.C. § 1983. Although Plaintiff is currently incarcerated at the Hutchinson Correctional Facility in Hutchinson, Kansas, his claims are based on his incarceration at the El Dorado Correctional Facility in El Dorado, Kansas ("EDCF").[1]  The Court screened Plaintiff's Amended Complaint (Doc. 9), and on March 13, 2026, entered a Memorandum and Order (Doc. 12) ("M&O"): 1) ordering Plaintiff to show good cause why his Eighth Amendment claim and his First Amendment claims based on the lack of library access, should not be dismissed for failure to state a claim; 2) finding that the proper processing of Plaintiff's mail censorship claim and retaliation claim could not be achieved without additional information from appropriate Kansas Department of Corrections ("KDOC") officials and ordering a *Martinez* Report for those claims; and 3) dismissing Plaintiff's due process claims, claims based on violations of prison regulations, and claims based on grievance responses and procedures, for failure to state a claim.

This matter is before the Court on Plaintiff's response (Doc. 14), and the KDOC's *Martinez* Report (Docs. 29–31).  The factual allegations in Plaintiff's Amended Complaint are set forth in

---

[1] On June 5, 2026, Plaintiff filed a notice indicating that he was transferred from EDCF to the Hutchinson Correctional Facility.  (Doc. 28.)

1

detail in the M&O.  In summary, Plaintiff's claims are based on alleged retaliation following his decision to remain silent during a prison investigation regarding his cellmate.

## I.  Eighth Amendment

Plaintiff claims that Defendant Clark ordered a mass shakedown of E Cell-house and Larry Teach retaliated against Plaintiff by destroying his property and room "in an unethical punitive shakedown" in violation of the Eighth Amendment's prohibition against cruel and unusual punishment.  Plaintiff acknowledges that the mass shakedown was performed on the entire cellhouse.  Plaintiff claims in his notarized statement of facts that after the shakedown there was hardly any concrete showing on the floor of his cell "because it was completely covered with legal work, clothes, books, etc. Body wash was spilled on books, papers, legal work; and boot prints [were] on everything for being scattered all over the floor."  (Doc. 8–1, at 29.)

A prison official violates the Eighth Amendment when two requirements are met.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  "First, the deprivation alleged must be, objectively, 'sufficiently serious.'"  *Id*.  To satisfy the objective component, a prisoner must allege facts showing he or she is "incarcerated under conditions posing a substantial risk of serious harm."  *Id.*; *Martinez v. Garden*, 430 F.3d 1302, 1304 (10th Cir. 2005).

The Eighth Amendment requires prison and jail officials to provide humane conditions of confinement guided by "contemporary standards of decency."  *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).  The Supreme Court has acknowledged that the Constitution "'does not mandate comfortable prisons,' and only those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation."  *Wilson v. Seiter*, 501 U.S. 294, 298 (1991) (internal citations omitted).  Indeed, prison conditions may be "restrictive and even harsh."  *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).  "Under the Eighth

2

Amendment, (prison) officials must provide humane conditions of confinement by ensuring inmates receive the basic necessities of adequate food, clothing, shelter, and medical care and by taking reasonable measures to guarantee the inmates' safety." *McBride v. Deer*, 240 F.3d 1287, 1291 (10th Cir. 2001) (citation omitted).

The second requirement for an Eighth Amendment violation "follows from the principle that 'only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.'" *Farmer*, 511 U.S. at 834. Prison officials must have a "sufficiently culpable state of mind," and in prison-conditions cases that state of mind is "deliberate indifference" to inmate health or safety. *Id*. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837. "The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'" *Id*. It is not enough to establish that the official should have known of the risk of harm. *Id*.

The Court found in the M&O that Plaintiffs' allegations fail to allege a "sufficiently serious" deprivation or facts showing he is "incarcerated under conditions posing a substantial risk of serious harm." The Court found that Plaintiff fails to state an Eighth Amendment violation, and his claims suggest, at most, negligence. Claims under § 1983 may not be predicated on mere negligence. *See Daniels v. Williams*, 474 U.S. 327, 330 (1986); *see also Vasquez v. Davis*, 882 F.3d 1270, 1277–78 (10th Cir. 2018) (deliberate indifference requires more than negligence) (citing *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)). The Court ordered Plaintiff to show good cause why his Eighth Amendment claim should not be dismissed for failure to state a claim, noting that to the extent Plaintiff alleges that the destruction of his property during the shakedown was retaliatory, that claim is addressed as part of Plaintiff's retaliation claim.

In his response, Plaintiff argues that Tyler Clark and Larry Teach inflicted unnecessary and wanton psychological pain on Plaintiff without any penological justification.  (Doc. 14, at 7.) Plaintiff then argues that the shakedown was calculated, retaliatory, and an attempt to harass and intimidate him.  *Id*.  Plaintiff claims that their actions created "a hostile environment that endangers both staff and inmates and can lead to violence."  *Id*. at 8.  Plaintiff alleges that their actions have caused him irreversible psychological harm.  *Id*.  Plaintiff claims that the shakedown was not routine, but was in retaliation for his civil lawsuits.  *Id*.

The Court advised Plaintiff in the M&O that to the extent he is claiming that the shakedown was retaliatory, that claim is addressed in his retaliation claim.  Plaintiff acknowledges that the mass shakedown was performed on the entire cellhouse.  Plaintiff has failed to show good cause why his Eighth Amendment claim based on the shakedown should not be dismissed for the reasons set forth in the M&O.  The Eighth Amendment claim is dismissed.

## II.  Court Access

Plaintiff claims that he was denied access to the library during his legal appeals.  (Doc. 9, at 6.)  Plaintiff alleges in his Amended Complaint, without explanation, that "Defendants' actions caused injury to his appeals and financial status."  *Id*.  Plaintiff claims that this denied him court access and freedom of speech.  *Id*.

In his response, Plaintiff argues that his right to court access was denied and delayed, which prejudiced him in pursuing his litigation pro se without having to hire an attorney.  (Doc. 14, at 2.) Plaintiff claims that he suffered an actual injury because the denial of library access "interfered with his ability to research, prepare, and timely submit legal filings."  *Id*. at 3.  Plaintiff claims that he was forced to hire counsel at the cost of $45,000.  *Id*.  Plaintiff claims that he "could not prepare, research, or obtain any legal materials for his initial pleadings for his in [sic] his civil rights actions

4

under federal habeas corpus 2254, his second state habeas corpus under K.S.A. 60-1507, and his state habeas corpus under K.S.A. 60-1501." *Id*. at 4.

Plaintiff states that his § 2254 federal habeas corpus was time-barred because his prior attorney (Kate Zigmata) failed "to stop his clock and advise him of the time limits during his state habeas appeal." *Id*. at 4. Plaintiff claims that he did not find out about the time bar until he was advised of it by David Miller at a consultation in June of 2024. *Id*. Plaintiff claims that "[s]hortly after this discovery [he] was barred from the law library and had to trust an attorney to do all of the work because of the law library restriction." *Id*.

It is well-established that a prison inmate has a constitutional right of access to the courts. However, it is equally well-settled that in order "[t]o present a viable claim for denial of access to courts, . . . an inmate must allege and prove prejudice arising from the defendants' actions." *Peterson v. Shanks,* 149 F.3d 1140, 1145 (10th Cir. 1998) (citations omitted); *Lewis v. Casey*, 518 U.S. 343, 349 (1996) ("The requirement that an inmate . . . show actual injury derives ultimately from the doctrine of standing.").

An inmate may satisfy the actual-injury requirement by demonstrating that the alleged acts or shortcomings of defendants "hindered his efforts to pursue" a non-frivolous legal claim. *Lewis*, 518 U.S. at 351-53; *see also Burnett v. Jones*, 437 F. App'x 736, 744 (10th Cir. 2011) ("To state a claim for violation of the constitutional right to access the courts, a prisoner 'must demonstrate actual injury . . .—that is, that the prisoner was frustrated or impeded in his efforts to pursue a nonfrivolous legal claim concerning his conviction or his conditions of confinement.'") (quoting *Gee v. Pacheco*, 627 F.3d 1178, 1191 (10th Cir. 2010)).

The right to access the courts does not guarantee inmates the right to a law library or to legal assistance, but merely to "the means for ensuring 'a reasonably adequate opportunity to

present claimed violations of fundamental constitutional rights to the courts.'" *Lewis*, 518 U.S. at 350–51 (quoting *Bounds v. Smith,* 430 U.S. 817, 825 (1977)). The right to access the courts is "only [the right] to present . . . grievances to the courts," and does not require prison administrators to supply resources guaranteeing inmates' ability "to litigate effectively once in court" or to "conduct generalized research." *Id*. at 354, 360.

Plaintiff alleges that he had to incur costs to have an attorney help with his state habeas cases. He does not allege that he was unable to file those cases. He also alleges that the lack of library access caused his federal § 2254 habeas action to become time-barred. However, in his response he states that the time-bar was his prior attorney's fault and his current attorney made him aware of the issue in June of 2024—prior to his library restriction in September 2024. The library restriction occurred after his new attorney made him aware of the issue.

Plaintiff alleges that his attorney's fees constitute an injury. The Supreme Court plainly held in *Lewis* that "the injury requirement is not satisfied by just any type of frustrated legal claim." *Lewis*, 518 at 354. Rather, the injury occurs only when prisoners are prevented from attacking "their sentences, directly or collaterally" or challenging "the conditions of their confinement." *Id.* at 355. "Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." *Id*. (emphasis in original); *see also Carper v. DeLand*, 54 F.3d 613, 617 (10th Cir. 1995) ("[A]n inmate's right of access does not require the state to supply legal assistance beyond the preparation of initial pleadings in a civil rights action regarding current confinement or a petition for a writ of habeas corpus.") (citations omitted).

Plaintiff indicated that he was placed in segregation on September 11, 2024, and he was denied library access during his one-week segregation and following his release. As set forth

6

below, the Report states that Plaintiff was not allowed to reinstate the Hustle 2.0 program in the library, but the librarian did not receive any notice of a restriction about Plaintiff and EDCF staff communicated to Plaintiff that he was not restricted from the EDCF library. *See* Doc. 29, at 6. The Report further provides that "even assuming Plaintiff erroneously believed he did not have access to the EDCF library, his cell house had a tablet he could reserve to use for his legal research." *Id*. at 7 (citing Exh. 17, at ¶ 4).

Plaintiff claims the lack of library access caused injury to his habeas corpus appeals. Plaintiff filed a motion under K.S.A. 60-1507 on June 10, 2022. *See Gillespie v. Kansas*, Case No. MI-2022-CV-000069 (District Court of Miami County, Kansas). The motion was filed by Plaintiff's attorney Adam Sokoloff on June 10, 2022. *Id*. The court granted the motion to file out of time. *Id*. At the January 24, 2023 hearing on the K.S.A. 60-1507 motion, the state court judge denied the K.S.A. 60-1507 motion. *Id*. On February 15, 2023, Plaintiff's attorney filed a Notice of Appeal, appealing the denial of the 1507 motion. *Id*. On March 22, 2024, the Kansas Court of Appeals affirmed the decision. *See Gillespie v. Kansas*, No. 126,273 (Kan. Ct. App.). The opinion by the Kansas Court of Appeals lists Adam Sokoloff as Plaintiff's attorney. Therefore, it appears that Plaintiff was represented by counsel throughout his first K.S.A. 60-1507 action, and the appeal was denied prior to the time Plaintiff claims he was denied library access.

Plaintiff filed a second K.S.A. 60-1507 action in Miami County on March 2, 2026, and he is represented by attorney David Miller. *See Gillespie v. Kansas*, Case No. MI-2026-CV-000034 (District Court of Miami County, Kansas). Although Plaintiff claims that it cost him $45,000 to hire his attorney, the actual injury requirement set forth in *Lewis* does not include attorneys' fees.

The Tenth Circuit has found that whether or not a party is represented by counsel or proceeding pro se "is important because a court-access claim is necessarily intertwined with the

7

assistance *vel non* of counsel." *Carr v. Zwally*, 760 F. App'x 550, 556 (10th Cir. 2019) (unpublished) (citing *United States v. Taylor*, 183 F.3d 1199, 1204 (10th Cir. 1999) ("It is well established that providing legal counsel is a constitutionally acceptable alternative to a prisoner's demand to access a law library."); *accord Lewis v. Clark*, 577 F. App'x 786, 796–97 (10th Cir. 2014) (unpublished) (affirming dismissal of court-access claim because prisoner was represented by counsel in underlying criminal case)).

Furthermore, the Tenth Circuit has recognized that "because there is no constitutional right to 'a hybrid form of representation,'" . . . "when defendants have the assistance of counsel, courts need not consider any filings made *pro se.*" *United States v. Sandoval-De Loa*, 283 F. App'x 621, 625 (10th Cir. 2008) (unpublished) (citing *United States v. McKinley,* 58 F.3d 1475, 1480 (10th Cir. 1995) and *United States v. Bennett,* 539 F.2d 45, 49 (10th Cir. 1976) ("[P]ermission for [hybrid representation] [is] recognized as being discretionary with the trial court."); *see also United States v. Castellon,* 218 F. App'x 775, 780 n.4 (10th Cir. 2007) (unpublished) ("[W]here a defendant is represented by counsel, we do not accept pro se filings or allegations.")).

The Court ordered Plaintiff to show good cause why his court access claim and freedom of speech claim regarding the lack of library access should not be dismissed for failure to state a claim. The Court noted that to the extent Plaintiff alleges that the lack of library access was retaliatory, that claim is addressed in Plaintiff's retaliation claim. Plaintiff's response fails to show good cause why his First Amendment claims based on the lack of library access should not be dismissed for failure to state a claim. Those claims are dismissed.

## III.  The *Martinez* Report

The Court ordered a *Martinez* Report for Plaintiff's mail censorship claim and retaliation claim.

8

### A. Mail Censorship

Plaintiff claims that Defendants Sparks and Leonard censored his mail based upon a "nonexistent 1 once rule." (Doc. 9, at 6.) Plaintiff alleges that Defendants violated his right to freedom of speech and his right to send and receive mail under the First Amendment. *Id*.

The Report provides that the one-ounce limitation in K.A.R. 44-12-601(g) is intended to limit the *printed* material sent into the facility, stating that "[t]his would, for example, assist to circumvent attempts to mail in photocopies of books and periodicals, instead of requesting those books and periodicals from KDOC approved vendors.". (Doc. 29, at 8–9) (citing Exh. 24). The Report provides that:

> On two (2) separate occasions, the Plaintiff alleges he was denied receipt of mail which weighed over one (1) ounce. (Doc. 9 at 6). On March 19, 2025 the Plaintiff was denied delivery of a 5.4 ounce packet of printed case law materials sent from Plaintiff's family member. (Doc 1-2 at 268-270). On September 18, 2025, another piece of mail exceeding one (1) ounce was denied. (Exhibit 25). The March 19, 2025 materials were mailed to Plaintiff marked as "Legal Mail," which appeared as an attempt to circumvent the applicable regulations (Exhibit 21 ¶ 9). Ultimately, the facility permitted Plaintiff receipt of those materials (Exhibit 21 ¶ 9).
>
> Photocopies of printed material from a non-legal source which weigh over one (1) ounce are censored and will continue to be censored for all residents. (Exhibit 21 ¶ 8).

*Id*. at 9.

Plaintiff also alleges that his mail was censored as a form of retaliation. Plaintiff's retaliation claim is addressed below.

### B. Retaliation

Plaintiff alleges that Defendants Williams, Ayala, Rudd, Clark, and Teach retaliated against him for remaining silent during the prison investigation regarding his cellmate. Plaintiff claims that these Defendants retaliated against him by: censoring his outgoing mail; destroying

9

his property in a shakedown; taking his job; denying him access to the library; and removing him from the Hustle 2.0 program.  (Doc. 9, at 6–7.)

The Report provides that:

> Plaintiff was celled with Richard Curtis #2000079501 (Curtis) from February 20, 2024, to September 21, 2025. (Exhibit 2). They were housed together in the Low/Medium cell house of the EDCF. (Exhibit 2). In May of 2024, the Plaintiff was assigned to an hourly-paid peer mentor for a new program called Hustle 2.0. (Exhibit 3 and Exhibit 13 ¶ 6). The Hustle 2.0 program is a self-directed in-cell study program for incarcerated adults. (Exhibit 4). Plaintiff was largely responsible for introducing the program at EDCF. (Exhibit 5). There was a staff supervisor of the program at EDCF, the Programs Director (Director), who worked inside the EDCF and directly supervised the resident peer mentors, Plaintiff and Curtis. (Exhibit 6).
> In September of 2024, EDCF EAI agents initiated an investigation into the Director for undue familiarity with resident Curtis – suspecting the Director of engaging in a sexual relationship with Curtis. (Exhibit 7). During the investigation the Plaintiff, who worked with the Director and Curtis, and who was also celled with Curtis, was asked to sit for an interview. (Doc. 9 at 7 at and Exhibit 8). Plaintiff agreed to sit for an interview with Defendant EAI Agent, Ayala, but indicated he would not provide any information. (Exhibit 8). The interview was recorded. (Exhibit 8).
> The Director was walked out of the EDCF facility on September 11, 2024, and she was terminated from KDOC employment. (Exhibit 9).

*Id*. at 3–4.

The Report states that due to the nature of the investigation, Plaintiff and Curtis were separated and temporarily moved to restrictive housing pursuant to IMPP 20-104A.  *Id*. at 5 (citing Exhs. 10, 11).  Plaintiff was moved to restrictive housing on Wednesday, September 11, 2026, was interviewed on Monday, September 16, and was released back into the Low/Medium cellhouse on Tuesday, September 17, 2026.  *Id*.   Plaintiff remained in restrictive housing for approximately four business days, "allowing EAI the opportunity to investigate the Director's relationship with Curtis, as well her relationship with Plaintiff" and such short-term placement in restrictive housing

was "essential to prevent communication and/or collaboration between Plaintiff and Curtis, who were celled together and both worked as peer mentors under the Director." *Id.* (citing Exhs. 11, 12). The Report provides that while Plaintiff's cooperation in the interview would have been helpful, "it was far from critical to the outcome of the investigation – the evidence of violations of the Prison Rape Elimination Act (PREA) was extensive." *Id.* (citing Exh. 7).

The Report further provides that when the Director was escorted out of EDCF on September 11, 2024, the Hustle 2.0 program effectively ended without a staff program sponsor. *Id.* (citing Exh. 13, at ¶ 10). "The peer mentor positions within the Hustle 2.0 program ceased to exist." *Id.* (citing Exh. 13, at ¶ 11.) The Report provides that as of September 11, 2024, "there were no other peer mentor programs at EDCF to which Plaintiff could have been transferred." *Id.* (citing Exh. 13, at ¶ 11). The Report provides that:

> Peer mentor positions are limited in quantity and by facility location. (Exhibits 13 ¶ 7 and 14). To be hired into any position, a resident must be in good standing, have no disciplinary reports within the last 120 days, and be reviewed by the Job Bank coordinator, Classification Administrator, and for certain positions the Enforcement, Apprehension, and Investigation (EAI) unit must also approve the resident. (Exhibits 13 ¶ 8 and Exhibit 14).
> On September 18, 2024, Plaintiff was placed on lay-in work status. (Exhibit 3 and Exhibit 15). There are a limited number of job positions at each facility for the number of residents eligible to work. (Exhibit 13 ¶ 12). When a welding position opened up in November of 2024, the Plaintiff was offered that position and accepted. (Exhibit 13 ¶ 13). The welding position is a skilled position. (Exhibit 13 ¶ 14). A welding position is one of trust such that a resident assigned to such position must demonstrate dependability and the willingness to learn the trade if they are new and do not have previous experience. (Exhibit 13 ¶ 14).

*Id.* at 5–6.

The Report also addresses Plaintiff's temporary restriction from library access. *Id.* at 6. The Report provides that:

11

> When the Hustle 2.0 program was operating at EDCF, it ran out of the facility library. (Exhibit 16 ¶ 6). During the investigation into undue familiarity between the Director and resident Curtis, it was determined that the suspected sexual contacts between the Director and Curtis occurred in the EDCF library. (Exhibit 7). During the investigation and close in time thereafter, both Plaintiff and Curtis were temporarily restricted from access to the library. (Exhibit 10 and Exhibit 11). After EAI completed its investigation, the Plaintiff repeatedly requested reinstatement of the Hustle 2.0 program at EDCF and approval to lead the program from the library, which was denied. (Doc. 9 and Exhibit 16 ¶ 9). Plaintiff continues to allege that he was denied access to the library, however the EDCF librarian never received any notice of restriction about Plaintiff.[2] (Exhibit 17 ¶ 7). Additionally, the Classifications Administrator, Kirbie Shearburn, communicated directly with Plaintiff in June of 2025, confirming that he, the Plaintiff, was not restricted from the EDCF library. (Exhibit 13 ¶ 16).

*Id.* The Report further provides that "even assuming Plaintiff erroneously believed he did not have access to the EDCF library, his cell house had a tablet he could reserve to use for his legal research." *Id.* at 7 (citing Exh. 17, at ¶ 4).

Plaintiff claims his property was destroyed during the shakedown cell search as an act of retaliation. The Report provides that resident cell searches are incident to incarceration, are often random, and may also be targeted upon reasonable suspicion. *Id.* (citing Exh. 18, and Exh. 19, at ¶¶ 7, 8). The Report provides that:

> Plaintiff alleges that a search of his cell on April 24, 2025, was retaliatory because he alleges a personal care item was damaged and his cell was left in disarray after the search. (Doc. 1-2 at 42). The search on April 24, 2025, was a planned large-scale search of the E Cell House where the Plaintiff resided at that time. (Exhibit 19 ¶ 10 and Exhibit 20). The search was a coordinated effort by security staff to find and confiscate contraband. (Exhibit 19 ¶ 11).

---

[2] EDCF Librarian Joyce Horsch declares that "[a]s the EDCF Librarian, I receive a list of restricted level residents who are unable to attend library call outs. . . . From September 2024 to present, I have never received any notification from Deputy Warden Tyler Clark, security officers, nor any other EDCF staff, that resident Gillespie was restricted from entering the library or from participating in library services." (Doc. 29–17, Declaration of Joyce Horsch, at ¶¶ 6, 7.)

12

> All cells of the E Cell House were searched on April 24, 2025.[3] (Exhibit 19 ¶ 10 ¶ 12). A large-scale cell house search requires a lot of staff and a lot of time. (Exhibit 19 ¶ 9). While security staff do not intend to damage resident property or toss cells, staff are not always able to leave cells as they were found and may occasionally break an item or turn over a personal care item. (Exhibit 19 ¶ 11).

*Id.*

Plaintiff also claims that Defendants used mail censorship as a form of retaliation. Plaintiff alleges that Defendants Sparks and Leonard gave Plaintiff's mail to Defendants Ayala and Rudd "without notice or written penological reason of the censorship." (Doc. 9, at 6.). Plaintiff claims the mail was not sent or delivered. *Id.* at 6–7. Plaintiff claims that his mail was censored without notice or due process. *Id.* at 7. In his prior response, Plaintiff stated that he filed a grievance asking about his mail being opened that he sent to family and friends, and "some of the mail was never received by the family and friends." (Doc. 8, at 5.) He also filed a grievance regarding "his mail is not being processed and sent out by the mailroom." *Id.* at 6.

The Report provides that:

> Correctional facilities across the nation are struggling to identify and thwart the introduction of drug contraband by mail, specifically through saturated paper. EAI at the EDCF and all KDOC facilities, work with mail room staff to identify attempts to send in contraband items. (Exhibit 21 ¶ 4). Upon visual inspection of mail, including, books and other periodicals, if mail room staff note concerns for saturation, like smudged type, staining, a chemical odor, etc., those items will be provided to EAI. (Exhibit 21 ¶ 4).
> There were several censors issued to Plaintiff for saturated material before the EAI investigation in September of 2024. (Exhibit 22). In October of 2022 and October of 2023, Plaintiff had incoming mail confiscated for concerns of saturation.[4] (Exhibit 22). On October 15, 2021, the Plaintiff pleaded guilty to a disciplinary report for trafficking after he attempted to introduce synthetic cannabinoids into the Ellsworth Correctional Facility (ECF) through

---

[3] Larry Teach, CSI at EDCF, declares that "[a]pproximately 104 cells were searched on April 4, 2025." (Doc. 29–19, Declaration of Larry Teach, at ¶ 12.)

[4] It appears that the dates are actually October of 2022 and March of 2023. *See* Exh. 22, Doc. 30–3, at 2.

saturated paper mailed to him there. (Exhibit 23).

Plaintiff was sent a book in January of 2025 which had stains, prompting mail room staff to provide the book to EAI. (Doc. 1-2 at 251-252 and Exhibit 22). The book was not provided to the Plaintiff, but he was given the opportunity to send the item out of the facility, which he did. (Doc 1-2 at 251-252 and Exhibit 22).

Another book was sent into the facility in February of 2025. (Doc 1-2 at 253-255 and Exhibit 22). That book was observed to have saturated pages and was confiscated by the EAI, but was also ultimately permitted to be sent out to family. (Doc 1-2 at 253-255 and Exhibit 22).

Further, neither EAI nor mail room staff need any reasonable suspicion to open incoming or outgoing mail. K.A.R. 44-12-601(b)(6) states, in pertinent part that, "Any incoming or outgoing mail other than legal, official, or privileged mail may be inspected or read at any time."

*Id*. at 7–8.

## IV. Discussion

"[I]t is well established that an act in retaliation for the exercise of a constitutionally protected right is actionable under [42 U.S.C.] Section 1983 even if the act, when taken for a different reason, would have been proper." *Smith v. Maschner*, 899 F.2d 940, 947 (10th Cir. 1990) (citations omitted). The Tenth Circuit has held that:

> Government retaliation against a plaintiff for exercising his or her First Amendment rights may be shown by proving the following elements: (1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.

*Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007).

However, an "inmate claiming retaliation must allege *specific facts* showing retaliation because of the exercise of the prisoner's constitutional rights." *Fogle v. Pierson*, 435 F.3d 1252, 1264 (10th Cir. 2006) (quotations and citations omitted). Thus, for this type of claim, "it is imperative that plaintiff's pleading be factual and not conclusory. Mere allegations of

constitutional retaliation will not suffice." *Frazier v. Dubois*, 922 F.2d 560, 562 n. 1 (10th Cir. 1990). "To prevail, a prisoner must show that the challenged actions would not have occurred 'but for' a retaliatory motive." *Baughman v. Saffle*, 24 F. App'x 845, 848 (10th Cir. 2001) (citing *Smith v. Maschner*, 899 F.2d 940, 949–50 (10th Cir. 1990); *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998)).

In light of the Report, the Court is considering dismissal of Plaintiff's retaliation and mail censorship claims. The Report shows that Plaintiff lost his job and his participation in the Hustle 2.0 program because the investigation involved the Director of the program, and when she was terminated the program and Plaintiff's job in the program were discontinued. The Report shows that Plaintiff was offered, and accepted, his desired welding job. The investigation also related to the library, explaining the brief lack of access.

Plaintiff claims his mail was censored based on a non-existent one ounce rule. However, the rule is set forth in the Kansas regulations. K.A.R. 44-12-601 provides that:

> Inmates may receive books, newspapers, and periodicals as permitted by the internal management policies and procedures of the department of corrections. All books, newspapers, and periodicals shall be purchased through account withdrawal requests. Only books, newspapers, and periodicals received directly from a publisher or a vendor shall be accepted. However, an inmate shall be permitted to receive printed material, including newspaper and magazine clippings, if the material is included as part of a first-class letter that does not exceed one ounce in total weight.

K.A.R. 44-12-601(g)(1). The Report also sets forth Plaintiff's past censorship issues and resulting disciplinary report for trafficking after he attempted to introduce synthetic cannabinoids into the facility. Other censored items were permitted to be sent to family.

A prisoner does not surrender his constitutional rights at the prison gates, but "simply because prison inmates retain certain constitutional rights does not mean these rights are not

15

subject to restrictions and limitations." *Bell v. Wolfish,* 441 U.S. 520, 545 (1979). "A prisoner has a constitutional right to have his outgoing mail processed for delivery, absent legitimate penological interests to the contrary." *Gee v. Pacheco*, 627 F.3d 1178, 1188 (10th Cir. 2010) (citing *Treff v. Galetka,* 74 F.3d 191, 195 (10th Cir. 1996)). This Court has noted that the Supreme Court recognized in 1974:

> [A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. Thus, challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law.

*Woodward v. Zmuda*, 2025 WL 2986836, at *5 (D. Kan. 2025) (quoting *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id*. (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). This "standard is necessary" to ensure that "prison administrators . . ., and not the courts, . . . make the difficult judgments concerning institutional operations." *Id.* (quoting *Jones v. N.C. Prisoners' Union*, 433 U.S. 119, 128 (1977)). " '[C]ourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." *Id.* at 84 (quoting *Procunier v. Martinez*, 416 U.S. 396, 405 (1074)).

"The Supreme Court has identified several factors relevant to determining the reasonableness of the prison restriction that allegedly violates the First Amendment, which are referred to as 'the *Turner* factors.'" *Woodward*, 2025 WL 2986836, at *5 (citing *see Al-Owhali v. Holder*, 687 F.3d 1236, 1240 (10th Cir. 2012)). The *Turner* factors are:

> (1) whether a rational connection exists between the prison policy regulation and a legitimate governmental interest advanced as its justification; (2) whether alternative means of exercising the right are available notwithstanding the policy or regulation; (3) what

> effect accommodating the exercise of the right would have on guards, other prisoners, and prison resources generally; and (4) whether ready, easy-to-implement alternatives exist that would accommodate the prisoner's rights.

*Id.* (citing *Al-Owhali*, 687 F.3d at 1240 (quoting *Beerheide v. Suthers*, 286 F.3d 1179, 1185 (10th Cir. 2002))).  "In the context of the initial screening of a prisoner's § 1983 complaint, the Court does not require a plaintiff to fully plead or argue the *Turner* factors."  *Id.* (citation omitted).  But "*Iqbal and Turner* require an inmate to 'plead facts from which a plausible inference can be drawn that the action was not reasonably related to a legitimate penological interest.' "  *Id.* (citing *Al-Owhali*, 687 F.3d at 1240 (quoting *Gee v. Pacheco*, 627 F.3d 1178, 1187 (10th Cir. 2010))).

The Court is considering dismissal of Plaintiff's mail censorship and retaliation claims for failure to state a claim.  The *Martinez* report developed as a means "to ascertain whether there is a factual as well as a legal basis for [a] prisoner's claims." *Gee v. Estes*, 829 F.2d 1005, 1007 (10th Cir. 1987).  "Courts may use a *Martinez* Report to clarify the complaint's factual allegations and assess their frivolity." *Martin v. v. Schnurr,* 2026 WL 1194984, at *4 (10th Cir. 2026).  However, the Report may not be used "to resolve . . . a [bona fide factual] dispute[.]" *Id.* (citation omitted).

The Court will grant Plaintiff an opportunity to respond to the Report and to show good cause why his remaining claims based on mail censorship and retaliation should not be dismissed for failure to state a claim.

## V.  Response Required

Plaintiff should show good cause why his mail censorship and retaliation claims should not be dismissed for failure to state a claim.  Failure to respond by the deadline may result in the dismissal of these claims without further notice for failure to state a claim.

**IT IS THEREFORE ORDERED** that Plaintiff's Eighth Amendment claim and his First Amendment claims based on the lack of library access are **dismissed** for failure to state a claim.

17

**IT IS FURTHER ORDERED** that Plaintiff is granted until **August 24, 2026,** in which to show good cause, in writing to the undersigned, why Plaintiff's mail censorship and retaliation claims should not be dismissed for failure to state a claim.

**IT IS SO ORDERED**.

**Dated July 24, 2026, in Kansas City, Kansas.**

<u>S/  John W. Lungstrum</u>
**JOHN W. LUNGSTRUM**
**UNITED STATES DISTRICT JUDGE**

18